UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ANDREW CHARLES HELTON, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>DAVID MILLS, WARDEN, )<br>)<br>Respondent. ) | No. 3:06-0140<br>Judge Trauger |

MEMORANDUM

I. INTRODUCTION

The petitioner, Andrew Charles Helton, proceeding *in forma pauperis*, brings this *pro se* action under 28 U.S.C. § 2254 seeking federal *habeas corpus* relief. Helton names David Mills, Warden at the West Tennessee State Prison, as the respondent.

II. FACTUAL BACKGROUND

The following facts relevant to Helton's conviction were adduced at trial. Leslie Hebert and several friends began partying at approximately 8:00 p.m. on November 28, 1997 at the apartment she shared with a roommate in Hendersonville. (Add. 2, Vol. I, pp. 5-9, 34-35)[1] Helton, Shayne Cochran, Michael Chatman, and Robert Cole arrived together at Hebert's apartment sometime after midnight. (Add. 2, Vol. I, pp. 36-37) Allison Dowell had arrived at Hebert's apartment at some time prior to the four men arriving. (Add. 2, Vol. II, p. 298; Vol. III, p. 324)

At approximately 4:00 a.m. the next morning Hebert, Helton, Cochran, Chatman, Cole, and Dowell went to "the Church," an after-hours club in Nashville, where Shirley Crowell joined them briefly. (Add. 2, Vol. I, pp. 9-11; Vol. II, p. 300; Vol. III, p. 303) Cochran, Chatman, Cole, Hebert, and Dowell left "the Church" shortly after they arrived and went to Helton's apartment to wait for him. (Add. 2, Vol. I, pp. 11-13, 39-41; Vol. III, p. 305)

---

[1]The addenda referred to herein were filed as part of Docket Entry 12.

When Helton did not show up after about twenty minutes (Add. 2, Vol. I, pp. 13, 42; Vol. III, pp. 306, 327), the group went to Chatman's apartment in Antioch where they arrived at approximately 6:00 a.m. (Add. 2, Vol. I, pp. 13-15, 42-43; Vol. III, pp. 308-309). Helton and Crowell arrived approximately forty-five minutes later while Chatman was upstairs changing clothes. (Add. 2, Vol. I, pp. 16-17, 43-44; Vol. III, p. 309) Helton and Cochran went outside to talk; Crowell went inside with the others. (Add. 2, Vol. I, pp. 17-19, 44; Vol. III., pp. 309, 329) Five to ten minutes later, Helton went inside and accused Chatman, who had just come downstairs, of stealing cocaine that belonged to him. (Add. 2, Vol. I, pp. 19-20; Vol. III, pp. 309-311) When Chatman denied stealing the cocaine, Helton drew a handgun – later identified as Interac, TEC-9, 9 mm semi-automatic pistol – from his jacket and shot Chatman in the stomach at close range. (Add. 2, Vol. I, pp. 20, 28;Vol. III, pp. 312-313; Vol VI, Ex. 2)

As Helton continued to fire, Hebert ran outside and hid in a bush. (Add. 2, Vol. I, pp. 21-22, 29) Hebert testified that, after she ran outside, she saw Cole still sitting on the couch, but he appeared to be "in shock." (Add. 2, Vol. I, pp. 21-22, 29) Dowell testified that she ran toward the rear of the apartment after which she saw Helton shoot Chatman – who was lying on the floor – in the mouth at near-point-blank range at which time she too fled the apartment. (Add. 2, Vol. III, p. 313-316) Harold Dixon, Chatman's next door neighbor, called the 911 operator. (Add. 2, Vol. I, pp. 142-144)

Dowell testified that Helton, Crowell and Cochran drove away but quickly returned. (Add. 2, Vol. III, pp. 317-318) Dowell's testimony that Helton and the others left but then returned was corroborated by the 911 tape (DE # 17) and the testimony of Harold and Janet Dixon on cross-examination (Add. 2, Vol. I, pp. 133-134, 148-150). Both Dowell and Janet Dixon testified that they heard another series of shots after Helton and the others returned. (Add. 2, Vol. I, pp. 134-135; Vol. III, p. 318) Dowell and Hebert ultimately left with Helton and the others. All were apprehended

2

later that morning.

The autopsy revealed that Cole was shot once in the scrotum, once in the right side of the head, and once above the left eyebrow. (Add. 2, Vol. II, pp. 258-261) Dr. John Gerber, M.D., the forensic pathologist who performed the autopsy, testified that the bullet that struck Cole in the scrotum was fired from a distance (Add. 2, Vol. II, p. 257), whereas the bullets that struck him in the head were fired from close range (Add. 2, Vol. II, pp. 262, 265). Dr. Gerber testified that Chatman suffered a contact gunshot wound to the abdomen (Add. 2, Vol. II, pp. 270-273) and a close gunshot wound above the right upper lip (Add. 2, Vol. II, pp. 274-275).

### III. PROCEDURAL BACKGROUND

The Davidson County Grand Jury returned a four-count indictment against Helton, Crowell, and Cochran on May 8, 1998 charging them with two counts of premeditated first-degree murder and two counts of felony murder in the shooting deaths of Cole and Chatman. (Add. 1, pp. 1-6) Helton and his co-defendants were tried together, their trial beginning on April 19, 1999 and concluding on April 22, 1999. (Add. 10) Judgment of acquittal was entered as to all defendants on the felony murder counts. (Add. 1, p. 23; Add. 2, Vol. III, pp. 353-356) Crowell and Cochran subsequently were acquitted on the remaining two counts. (Add. 1, p. 26; Add. 2, Vol. III, pp. 356-360; Vol. IV, pp. 468-478) Helton, on the other hand, was found guilty of first-degree murder in the death of Cole and second-degree murder in the death of Chatman. (Add. 1, pp. 27-29; Add. 2, Vol. IV, pp. 481-484) He received concurrent sentences of life and twenty-three years respectively. (Add. 1, pp. 28-29) Helton's motions for a new trial and judgment of acquittal were denied. (Add. 1, pp. 30-34) He filed a notice of appeal on August 15, 1999. (Add. 1, p. 35)

Helton raised two issues on direct appeal: 1) whether the evidence was sufficient for a rational trier of fact to find him guilty of first- and second-degree murder; 2) whether the trial court erred in admitting crime scene and autopsy photographs into evidence. (Add. 3, p. 2) The

3

Tennessee Court of Criminal Appeals ("the Court of Criminal Appeals") affirmed the judgment of the trial court on October 13, 2000 (Add. 5), following which the Tennessee Supreme Court denied Helton's application for permission to appeal on April 23, 2001 (DE # 8). Helton did not file a petition for a writ of *certiorari* in the United States Supreme Court ("the Supreme Court").

Helton filed a *pro se* petition for state post-conviction relief on June 29, 2001. (Add. 9, pp. 7-13) When later represented by counsel, he filed an amended petition on November 25, 2003, incorporating by reference the issues that he raised in his *pro se* petition. (Add. 9, pp. 24-29) Following an evidentiary hearing on March 1, 2004 (Add. 10), Helton's petition for post-conviction relief was denied on April 8, 2004 (Add. 9, pp. 33-40). Helton filed a notice of appeal on April 21, 2004. (Add. 9, p. 41)

On appeal from the judgment of the post-conviction court, Helton raised the following issues: 1) whether the post-conviction court erred in finding insufficient evidence of prosecutorial misconduct; 2) whether the post-conviction court erred in finding insufficient evidence of ineffective assistance of counsel. (Add. 11, p. iii) Helton's ineffective assistance claims were that defense counsel was ineffective for not objecting to the prosecution's alleged misrepresentation of the 911 tape, and for not allowing the jury to listen to the 911 tape during their deliberations. (Add. 11, p. iii) The Court of Criminal appeals affirmed the judgment of the post-conviction court on May 31, 2005 (Add. 13) after which the Tennessee Supreme Court denied his application for permission to appeal on October 17, 2005 (Add. 16). Once again, Helton did not file a petition for a writ of *certiorari* in the Supreme Court.

The instant action originally was filed in the Western District of Tennessee on January 19, 2006, *Helton v. Mills*, 2:06-02040 (W.D. Tenn.)(McCalla, J.), but was transferred to the Middle District of Tennessee on February 16, 2006. Helton raises two grounds for relief in his petition: 1) defense counsel was ineffective for not allowing the jury to hear the 911 tape during their

4

deliberations (DE # 1, pp. 4-5); 2) defense counsel was ineffective for not objecting to the prosecution's alleged misrepresentation of evidence on the 911 tape (DE # 1, pp. 5-6). On March 6, 2006, the respondent was directed to file an answer, plead or otherwise respond to the petition. (DE # 7) The respondent filed an answer and a copy of the record of the proceedings in state court on May 15, 2006. (DE #11-12) More than thirty days have passed since the state responded to the petition and Helton has not filed a response. Therefore, this matter is properly before the court.

## IV. ANALYSIS

Petitions for federal *habeas corpus* relief filed after April 24, 1996 are subject to the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996) (AEDPA). *See Martin v. Mitchell*, 280 F.3d 594, 602 (6th Cir. 2002)(citing *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1977). Title 28 U.S.C. § 2254, as amended by the AEDPA, provides the following with respect to granting a writ of *habeas corpus* to prisoners who are in custody pursuant to a state court judgment:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
> 
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> 
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "unreasonable application" of clearly established federal law differs from an "incorrect application." *Williams v. Taylor*, 529 U.S. 362, 365 (2000). Under the former, "a federal *habeas corpus* court may grant relief if the state court identifies the governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's

5

case." *Id*. The latter clause is satisfied when a state court "arrives at a conclusion opposite that reached by [the Supreme] Court on a question of law or . . . decides a case differently than the Court . . . on a set of materially indistinguishable facts." *Id*. at 364-65. Where state courts have made factual determinations regarding issues presented for federal *habeas corpus* review, such determinations are presumed to be correct, and the petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Miller-el v. Cockrell*, 537 U.S. 322, 324 (2003). Under the AEDPA, the purpose of federal *habeas corpus* review is to "ensure that state court convictions are given effect to the extent possible under the law," not to conduct a federal re-trial. *Bell v. Cone*, 535 U.S. 685, 693 (2002).

To prevail on a claim of ineffective assistance of counsel, a *habeas* petitioner must show deficient performance and prejudice. *See Bell v. Cone*, 535 U.S. 685 , 694-95 (2002). Trial counsels' performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). In determining whether an attorney performed in an objectively unreasonable manner, courts employ "highly deferential" scrutiny. *Id*. at 689. To satisfy the prejudice requirement, an ineffective assistance claimant "must show that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996)(quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992)(*en banc*), *cert. denied*, 508 U.S. 975 (1993)). Moreover, "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . ." *Strickland*, 466 U.S. at 669.

6

### A. Ineffective Assistance of Counsel for Not Permitting the Jury to Hear the 911 Tape During Jury Deliberations

Helton asserts that, had defense counsel permitted the jury to hear the 911 tape during their deliberation, the jury would have heard "a witness to the shooting . . . describe[] only one series of shots" which was contrary to the prosecution's theory that there were two series of shots, the prosecution's theory being central to the question of premeditation. (DE # 1, pp. 4-5) The 911 tape had been played in open court during the testimony of Harold Dixon who made the call. (Add. 2, Vol, I, p. 143)

Helton raised this issue in his amended petition for post-conviction relief. (Add. 9, ¶¶9, 25) The issue was addressed at length at the post-conviction evidentiary hearing. (Add. 10, Vol. I, pp. 14-19, 26-29, 42-45) The following related testimony by defense counsel was adduced by post-conviction counsel at the evidentiary hearing:

> Q     Do you recall that at some point during jury deliberations a question arose from the jury about whether they could hear that tape again?
>
> A     Yes, ma'am.
>
> Q     Okay. And what was your response when that was raised with you?
>
> A     My first response was to – well, two things. First off, I forgot what was on the tape and I said I didn't want the jury to hear it.
>
> Q     Okay, so the result was that the jury did not get to hear the tape a second time, correct?
>
> A     That's correct.
>
> Q     In retrospect, is that something that you would have preferred to made a different decision on?
>
> A     Yes, ma'am. When I got the call that the jury had a

7

>question and wanted to hear the tape, my immediate response was to come to the courthouse and say we don't want them to hear it because I remembered it differently than it actually was.
>
>After we had left the courtroom to go back to my office . . . I listened to the tape, and discovered at that point that I had completely misremembered what was on the tape and realized I had made a mistake.
>
>Q    Okay. So if you had it to do over again?
>
>A    If I had listened to the tape before I went over my decision would have been completely different, yes, ma'am.

(Add. 10, Vol. I, pp. 17-18)

On cross-examination, the State elicited the following additional testimony from defense counsel:

>Q    When they ask[ed] to hear the tape, you didn't know, still don't know to this day what they were looking for in that tape, do you?
>
>A    I had a theory, but I wasn't in the jury room so I don't know exactly.
>
>Q    And we just don't know, do we? We never know what a jury, the reason they do something?
>
>A    We don't know, that's true.
>
>Q    And every time a jury asked to hear something or for a definition or for an explanation, it's kind of a crap shoot, isn't it?
>
>A    You mean speculation as to what they want?
>
>Q    Yes, sir.
>
>A    Yes, sir, generally. Sometimes they are pretty clear, but sometimes they are not, you're right.

Q But it's still speculation?

A Yes, sir.

Q On our part. And we don't know whether or not your decision to object to the tape being replayed was good or bad for your client, do you?

A Well, we know he got convicted of first degree murder, so it wasn't good.

Q We don't know if that's what did it?

A That's true.

Q And we don't know had they heard the tape would they have been out a shorter period of time with the same conclusion?

A We don't know that, yes, sir.

Q Okay. And in any event, what you have to do as a trial lawyer in a case like that, with reams of information and evidence you have to make a decision right then, don't you?

A Generally, yes, sir.

Q You don't get to go back and ask them, now exactly what are you-all looking for in this, maybe I can help you out.

A. That's true.

Q Didn't get to do that did you? So you have to make a decision?

A. Right

Q In the heat of battle, so to speak?

A Right . . . .

(Add. 10, Vol. I, pp. 27-29)

9

On re-direct examination, post-conviction counsel elicited additional testimony from defense counsel that he "thought [he] made a mistake as soon as [he] realized [he] misremembered what was on the tape," that the 911 tape only made reference to "a single series of shots," that he knew he had made an error "[w]ithin 20 minutes after making the decision," and that he could not think of a way of getting the court to permit him to change his objection. (Add. 10, Vol. I, pp. 43-45)

In its Order denying the Helton's petition for post-conviction relief, the post-conviction court wrote that:

> Mr. Alderman testified that he was under pressure when he made the decision to not allow the jury to hear the tape again. He said that he had remembered the tape differently and did not want the jury to have another chance to hear it. Mr. Alderman testified that he would have done it differently if given the opportunity, but he acted on the spur of the moment in making his decision to refuse to let them hear the tape a second time. It is not the Court's function to ''second guess'' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by ''20-20 hindsight.'' It follows that 'counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result.'
>
> Moreover, there is no indication as to what the jury was looking for when they made their request. Without testimony from any of the jurors, it is pure speculation to contend that they wanted to hear the tape to make sure that it showed that only one set of shots were fired.
> . . .

(Add. 9, pp. 35-36)(internal citations omitted) On appeal, the Court of Criminal Appeals affirmed the judgment of the post-conviction court writing:

> In assessing trial counsel's performance at trial, 'it is not [the reviewing court's] function to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'' A particular decision does not render trial counsel's conduct deficient if the decision was 'within the range of competence demanded of attorneys in criminal cases.' Based upon our review of the record, we find that the evidence does not preponderate against the trial court's finding that

10

> trial counsel's decision concerning the request posed by the jury during the deliberation was within the range of competence demanded of attorneys in criminal cases.

(Add. 13, p. 9)(internal citations omitted) In other words, the Court of Criminal Appeals determined that defense counsel's decision did not amount to deficient representation. Helton asserts that defense counsel's opposition to permitting the jury to hear the 911 tape "was not a 'strategic' error or decision as the lower court has held, but rather a plain error." (DE # 1, p. 5)

The Court of Criminal Appeals cited *Stickland* as controlling in those instances when ineffective assistance of counsel is alleged. (Add. 13, p. 6) The Court of Criminal Appeals also correctly noted that, under *Strickland*, the distorting effects of hindsight are to be avoided, trial strategies and tactics should not be second-guessed, an act or omission of defense counsel is not unreasonable merely because a particular strategy or tactic is unsuccessful, and alleged errors by counsel should be judged from the perspective of counsel at the time those errors were made and in light of all the facts of the circumstances at the time. (Add. 13, p. 6)

Helton's argument that defense counsel's decision not to permit the jury to hear the 911 tape constituted "plain error" is appealingly simple. However, defense counsel's action to prevent the jury from hearing the 911 tape again did, in fact, amount to a tactical decision – a tactical decision not to permit the jury to hear what he mistakenly believed under the time-constrained circumstances of the moment might have been damaging to Helton's case. That defense counsel viewed his actions to have been mistaken after the fact does not diminish the fact that defense counsel acted in what he thought were his client's best interests. As the Supreme Court established in *Strickland*, defense counsel's actions do not become objectively unreasonable merely because a particular strategy or tactic proves unsuccessful. Thus, the Court of Criminal Appeals' determination that defense counsel's representation was not deficient was neither contrary to nor an unreasonable application of clearly established federal law.

11

Even if it were determined that defense counsel's representation did fall below the range of competence expected of attorneys in criminal trials, Helton has not established that he was prejudiced by defense counsel's action. (Add. No. 13, p. 9) First, the 911 tape was, in fact, played to the jury during the course of the trial. (Add. 2, Vol. I, p. 143) Second, as established *supra* at pp. 7-10, it is sheer speculation that the jury asked to hear the 911 tape again to determine how many series of shots were fired. As the post-conviction court noted, and as the Court of Criminal Appeals considered, none of the jurors were called to testify at the post-conviction evidentiary hearing. (Add. 9, p. 36; Add. 13, p. 9) Speculation will not support federal *habeas corpus* relief. *See e.g., Turpin v. Kassulke*, 26 F.3d 1392, 1401 (6th Cir. 1994).

Helton also argues that "the testimony of Janet and Harold Dixon, and Leslie Russell clearly state that none of them heard a second series of shots after the defendant returned to the apartment." (DE # 1, Attach. Memo. of Law, p. 8) The record does not support his contention. Leslie Russell, another of Chatman's neighbors, testified only that she "heard a loud pop sound, a loud sound." (Add. 2, Vol. II, p. 153) As to whether there was more than one shot, which there clearly were, or more than a single series of shots, she was never asked those questions, nor did she offer unsolicited testimony to that end. (Add. 2, Vol. II, pp. 152-165)

Helton's claim that Janet Dixon testified that there was only a single series of shots clearly is incorrect. Janet Dixon testified that she "heard about three popping sounds," after which she heard a "car driving away." (Add. 2, Vol. I, pp. 132-133) She then testified that she:

> remember[ed] a car coming back into the parking area. I heard more voices. I heard a couple of more popping sounds. Then I heard someone going into the apartment next door and bounding up the stairs. And then after that, they came down the stairs, out the door. And I heard the door slam shut behind them.

(Add. 2, Vol. I, p. 134) Dowell, who was present when Helton shot Chatman, testified that Helton, Crowell, and Cochran left in a car but came back shortly afterwards. (Add. 2, Vol III, pp. 317-118)

12

According to Dowell, when Helton, Crowell, and Cochran returned, all three of them went back into the house at which time Dowell heard more gunshots. (Add. 2, Vol. III, pp. 318, 335-336)

As to the 911 tape itself, Mr. Dixon's initial comments to the 911 operator establish that the call was made because shots already had been fired. (DE # 17) Although the quality of Mr. Dixon's half of the conversation is spotty after he describes Helton and the others returning and going back into the apartment, the 911 operator subsequently asked Mr. Dixon how many shots he had heard fired, to which Mr. Dixon replied "probably three or four." (DE # 17) It is unclear, however, whether Mr. Dixon's answer pertained to shots that prompted his call to the 911 operator in the first place, or shots that Mr. Dixon heard after Helton and the others returned, *i.e.*, shots fired during that portion of the 911 tape in which his half of the conversation was unintelligible.[2]

It is the responsibility of the jury to weigh the credibility of witnesses. *Fulcher v. Motley*, 444 F.3d 791, 809 (6th Cir. 2006). It appears from their verdict that the jury credited the testimony of Janet Dixon and Dowell over the statements made by Harold Dixon to the 911 operator. Given the speculative nature of this claim, and given that there was evidence introduced at trial that there were two series of shots, not just the one as Helton claims, Helton cannot show that he was prejudiced because defense counsel objected to the jury hearing the 911 tape a second time.

For the reasons explained above, Helton has failed to establish that he is entitled to federal *habeas corpus* relief on the grounds alleged. Accordingly, this claim is without merit.

> B. Ineffective Assistance of Counsel for Failing
> to Object to the Prosecutor's Alleged

---

[3] At the post-conviction hearing, defense counsel testified that: "[T]he 911 tape . . . is relatively clear that there is only one series of shots, and that's both ***because you hear the shots*** and because you hear this man describing what he is hearing to the dispatcher as I recall. So that's consistent with there being one series of shots as opposed to a series of shots, a break and then another series of shots." (Add 10, Vol. 1, p. 16)(emphasis added) Although no shots can be heard on the copy of the 911 tape filed in this action, it is clear from the tape that the first series of shots would not have been captured on the 911 tape because the call was made to the 911 operator after those shots had been fired. Thus, assuming that defense counsel's recollection of the copy of the 911 tape that he heard was correct, then any shots that could be heard would have been a second series of shots.

13

## Misrepresentation of the 911 Tape

The thrust of this claim is that defense counsel was ineffective for not objecting to the following statement made by the prosecution during closing argument:

> [Y]ou were able to here [*sic*] on the 911 tape how long a period of time it was from when the vehicle first left with Mr. Helton in it to the time that it returned. It was at least mid-way through that call before the car returned. And you know, from description of the eye-witnesses that it was on that return to the apartment, after having a chance to go away with at least Mr. Cole still being alive, he choose to go back in the apartment and fire more shots.

(DE # 1, Attach. Memo. of Law, p. 10; Add. 10, Vol. II, Trans., p. 4) According to Helton, the prosecution misrepresented the contents of the 911 tape in the foregoing statement and, as such, defense counsel should have objected.

Helton raised this issue in his amended petition for post-conviction relief. (Add. 9, ¶ 11, p. 26) Although it does not appear that this issue was addressed at the post-conviction evidentiary hearing, the post-conviction court addressed it in its Order nevertheless. (Add. 9, p. 39) In its Order denying post-conviction relief, the post-conviction court determined that:

> Even if the petitioner contends that there was only one series of shots, the responsibility of weighing the testimony of the witnesses was left to the jury, and they evidently credited the State's witness. The Court is of the opinion that any alleged prosecutorial misconduct with regard to the misrepresentation of the evidence was unintentional and ultimately inconsequential. The jury was apparently aware that the evidence against the petitioner was simply insurmountable . . . .

(Add. 9, p. 39) In its opinion on appeal, the Court of Criminal Appeals wrote:

> Petitioner contends that the State erroneously told the jury that the 911 tape supported its theory that Petitioner fired another round of gunshots after he returned. We do not read the State's comments in that light. The State relied on the caller's comments to the 911 operator to establish that the petitioner started to drive away from the crime scene, and then returned in a few minutes. The State then argued that two witnesses testified that they heard a series of gunshots after Petitioner returned to the apartment. Petitioner

14

> testified that he did not fire his weapon the second time he was in the apartment. As the trial court observed, this is a matter of the witnesses' credibility which was properly left to the jury. The evidence does not preponderate against the trial court's findings that Petitioner failed to show that his trial counsel was ineffective for failing to lodge an objection during the presentation of the State's closing argument.

(Add. 13, p. 8)

The court concurs with the Court of Criminal Appeals' reading of that part of the prosecution's closing argument at issue. The prosecutor's statement is clearly divided into two parts, the first part linking the 911 tape to "how long a period of time it was from when the vehicle first left with Mr. Helton in it to the time that it returned," and the second part linking the two series of shots to the "description of the eyewitnesses." Because the prosecution's argument at issue does not misrepresent the facts that were before the jury, defense counsel's representation was not deficient for having not objected.

The Court of Criminal Appeals' determination of defense counsel's representation on this issue is neither contrary to nor an unreasonable application of clearly established federal law. Therefore, Helton is not entitled to federal *habeas corpus* relief on the grounds alleged.

15

C. Certificate of Appealability

Where, as here, the district court denies a ground for relief on the merits in a *habeas corpus* action, a certificate of appealability (COA) "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Court has independently determined that the petitioner has not made a substantial showing of a denial of a constitutional right with respect to either of his claims. Therefore, should the petitioner file a timely notice of appeal from this Order, such notice will be docketed as both a notice of appeal and an application for a COA, 28 U.S.C. § 2253(c); *Slack*, 529 U.S. at 483; Rule 22(b), Fed. R. App. P., which will not issue, *see Castro v. United States of America*, 310 F.3d 900, 901 (6th Cir. 2002); *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001); *Porterfield v. Bell*, 258 F.3d 484, 485-487 (6th Cir. 2001); *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997).

V. CONCLUSION

As reasoned herein, Helton has failed to establish that he is entitled to federal *habeas corpus* relief on the grounds alleged. Therefore, his petition will be denied and this action dismissed. Moreover, as Helton has failed to make a substantial showing of the denial of a constitutional right, a COA will not issue as to either of his claims.

An appropriate Order will enter.

Aleta A. Trauger
United States District Judge